Okay, please be seated. Mr. Clark, please call the second case. Case number 07-1333, People v. Wayne Willis. Okay, counsel, if you could approach. Let us know who you are and who you represent. Good morning, your honors. My name is Assistant States Attorney Amy Wotroba on behalf of the people of the state of Illinois. And I'm Darrell Lohman on behalf of the appellant, Mr. Wayne Willis. Okay, 15 minutes per side and if you need a little extra time, we'll probably give it to you. Now, understand, since you wrote your briefs, there's been substantial new law, whether it's pluralistic or whatever you want to call it. But I would hope that you would mainly address Williams and Leach and forget about what mainly was in the older briefs. Absolutely. All right. Thank you. Great. Oh, one other qualification. It's my understanding, so I know from the briefs, it looked like you were saying that they were, something was admitted into evidence when it was not admitted. I'm sorry, your honor? Something? Basically, that the witness's testimony was admitted in evidence. The testimony, yes. You say it was? The testimony was, yes. Is your honor referring to the reports? The record was not. I'm sorry, I don't understand what you're... Well, go ahead. I'll figure out when I hear what you have to say. Okay. Please proceed. Good morning, your honors. And may it please the court, again, I'm Darrell Lohman and I represent the defendant appellant in this case, Mr. Wayne Willis. This case returns to this court on remand after the United States Supreme Court's 414 split decision in Williams v. Illinois, and this court is left in the unenviable position of trying to make some sense of that mess. Follow a mandate. Was there a mandate? What is the mandate? The mandate from the United States Supreme Court, simply to vacate this court's earlier decision and to reconsider it in light of Williams v. Illinois. My understanding is there were a large number of these cases pending cert granted in the United States Supreme Court held in the bands... Well, let's get right to it then. What does Williams say? What is there to follow precedentially in Williams and how did Leach follow it or attempt to follow it? That's where we're at. Williams itself has no precedential value. To the extent lower courts have, like I said, there's a large number of these cases, other courts are placed in this position as well, and we'll have to figure out what sense you can make of it. To the extent there's overlap of five or more justices in the opinion, courts have deemed that to be a holding and trying to take something from that in the case. But actually, because of the similarity between this case and Williams, there is no precedential value because we're left in the same position of there being a 4-1-4 split on the court. And as Justice Kagan pointed out in her dissent, lower courts are left in the position to have to rely on the five justice majority decisions. In the United States Supreme Court's earlier cases of Bull Cumming and Melendez-Diaz, both of which were issued after this court's initial decision in this case in 2009. What about, though, the possibility of relying for precedent on the four-justice plurality plus the narrowest, following the narrowest grounds analysis, tying that to Justice Thomas, who says you have to have the indicia of formality or solemnity, which is his position consistently. And in this case, you know, you don't have that. Why can't we follow that, you know, analysis? Well, the problem in this case is there's not actually overlap. So you have Justice Thomas's position, which is the one that stands by itself. But also in his separate concurrence, he specifically rejected every single aspect of Justice Alito's four-justice factions' opinion so that there's not the sort of overlap that you see in, for example, the case relied on by the state, Marx v. The United States. I know. He disagrees that they weren't offered for the truth of the matter asserted and disagrees that they weren't used to facilitate or, you know, to aid criminal prosecution. But what about on just that one narrow finding that since these are not, the evidence in this particular case, as was in Williams, is not an affidavit, it's not testimony, it doesn't have the solemnity or formality that he suggested it should have, so it doesn't trigger a confrontation clause analysis. The four justices in the plurality said that the confrontation clause wasn't triggered. Why can't we tie those two together on a narrow grounds basis and use that? Well, because as Your Honor points out, the rule is the narrowest common ground. So you have to look for some form of overlap between the plurality and whatever number of extra justices are required to create a majority. And there's nothing? And there's not. And I could, it's very stark by example to the Marx case that the state cites where you had a three-justice plurality, which you think that's not nearly enough to actually be the law to hold in the future. But actually the two justices concurring in that case actually had a broader interpretation of the First Amendment that was at issue in that case. So you had three plus two more gives you five. You have the judgment, but the plurality controls, it's almost like a Venn diagram of my hands, the plurality is going to control because it's a subset of the larger five-justice majority opinion. Because there was a nexus there. Yeah, there's a nexus, there's an overlap, and then in that case you actually had three separate dissents and they're off here somewhere. So those are thrown out. If your argument is correct though, and let's assume for the moment that it is, if your argument is correct and Williams doesn't stand for anything, how are we supposed to follow that after we have the Leach decision, which appears to say it stands for something? Leach stands for autopsy reports, and it's an example of the lower court, as I mentioned, taking Williams as a whole and trying to parse out areas where there's overlap.  Thomas Kagan, under any of those, autopsy reports are not going to be considered testimonial. Therefore, autopsy reports under any of the nine judges in the Williams case would consider that to be not testimonial. What the court also did in Leach was distinguish DNA testimony specifically. They said autopsy reports are generated for a variety of reasons and not only to provide evidence in a criminal case. And they left a possible exception for a case where the police play a direct role and the purpose of the autopsy is clearly to provide evidence for use in a prosecution. That's actually analogous to the sort of DNA evidence that you have in a case like this, where the DNA is going through the Illinois State Police Crime Lab in connection with an open sexual assault investigation, and it's contracted out to Solmark in Baltimore, again, in connection with this open investigation. So even if this were an autopsy case, under these facts, it would be considered testimonial under the court's ruling in Leach. The other thing that Leach certainly stands for is harmless error. And I think you've got some issues there, given the confession and the corroboration of the testimony of the victim. How do you get past harmless error? If we want to just sort of avoid this whole Williams-Leach plurality, what does it stand for? Can't we just hang our hat on harmless error here? Well, that's certainly what the court did in Leach, but Leach had, again, a much more difficult problem than I have here. In this case, the only evidence tying Mr. Williams to the offense is his own testimony in custody. So to the extent there's no corroboration for that, I mean, the case at trial was that the DNA is admitted substantively. It ties into the offense. That's all out the window now. All you have is this custodial statement, and I think this court has seen. How can you ignore what the victim said? Well, the victim didn't identify him. She was attacked from behind. She had no idea he was an attacker. I didn't say, how can you ignore the victim's identification? I said, how can you ignore what the victim testified to that did corroborate? What he was wearing, where it occurred, how it happened, how he covered her up, how he told her to count to 50, how he told her to give him personal information. How do you ignore that? I don't think you should ignore it. I think Your Honor is mistaken in a few of the particulars. That certainly could be. She was unable to identify specifically where it happened. I mean, she did her best. It's true. But her testimony was not only unable to identify him, she actually was very sketchy in terms of the details, which is understandable. The question becomes, is that sufficient corroboration that Mr. Willis was the person who attacked her, and she admittedly did not know who attacked her, and she could not describe who attacked her, because she was attacked from behind. Turning to the Bullcoming case, which is the most immediate case prior to Williams v. Illinois, which had a five-justice majority, that case held very similar to the facts of this case, that you cannot put on a surrogate witness. In this case, we had Dr. Reynolds from Solmark Labs flying out to Chicago to testify concerning testing that was performed by analysts at Solmark that she did not observe, that she had no personal knowledge of. They had the option of flying out one of those analysts, probably at less of a cost, but instead they flew out Dr. Reynolds. Well, at the time, they believed that would be the case. That would be valid and upheld. But in 2011, the United States Supreme Court specifically condemned that sort of what they called surrogate testimony, and said if you're going to have forensic evidence, it has to be put on through somebody who performed, or at least observed the tests, and therefore was in a position to have personal knowledge to what the analysts did, and therefore could be cross-examined. Remember, this is all in the context of the Confrontation Clause. There has to be some sort of basis to cross-examine the expert on what exactly occurred in the lab. In this case, Dr. Reynolds doesn't know what happened in the lab. She wasn't there. Under Bullcoming... Dr. Reynolds co-signed the report from Solmark. She did. But to the extent of her examination at trial, was that she did not observe the testing, that she did not conduct any of the testing. And these are the two factors that the United States Supreme Court said was salient in Bullcoming v. Mexico. So therefore, if we're left as 4-1-4 split in Williams, and it doesn't stand for anything, and Justice Kagan said we should look to Bullcoming and Melendez-Diaz to figure out what's the law for forensic evidence, and of course this Court should also look to Leach, because this is Illinois and it's an Illinois Supreme Court decision. But Leach itself is not on point on DNA. In fact, it distinguishes DNA evidence, as I've explained. Bullcoming, as I was saying, condemned the sort of surrogate testimony at issue in this case. And once that decision came down, that was deemed to be testimonial hearsay and inadmissible. And in terms of which specific law should apply, and what the precedential value of Williams is, this Court held in Mercury Indemnity Company that these sorts of decisions without majorities have limited precedential value. And in that case, this Court cited Ferguson v. McKenzie, and the quote from that case is, if a majority merely agrees to a particular result without agreeing to the grounds for the decision, and I would say that's what we have in Williams, the parties are bound by the decision, but the case provides no binding authority beyond the immediate parties. So the parties in Williams are the people, but also Mr. Williams. In this case, we have a different defendant, different parties. There's no precedential value that can be assigned to future cases. If the Leach Court had said that it's not precedential and there's nothing to follow, I'd be with you. But I don't think they really said that. I don't think they're with you on that. Well, I would submit that they didn't have to address the issue. They did, like Your Honor said, avoided the quagmire, found, among other things, that it was harmless, but also found that if the plurality controls, you lose. If Justice Kagan's ruling controls, you lose. If Justice Thomas's ruling controls, you lose. We don't have that in this case. We have, I'll admit it, if Justice Alito's opinion controls, we lose. But Justice Alito only has four signatories to that, which, incidentally, as the Illinois Supreme Court pointed out in Leach, the four signatories to the plurality are the same as the dissenting justices in Melendez-Diaz and in Bolkoming. So to say that that's the law is to say that this dissenting faction is announcing the law of the land, when there's five votes specifically against it, not only in Bolkoming and Melendez-Diaz, but in Williams, there were five votes against that. So whatever the law is, it's not Justice Alito's opinion on what the law is. There's only four justices for that. For that to be the law, there's going to have to be some sort of change in the court so you get a fifth justice to sign on to that. It would be a mistake for this court to elevate that to the law of the land. And I don't believe the Illinois Supreme Court did that in Leach. I think they did, as Your Honor is pointing out, kind of avoid the quagmire, say you lose under any of four different theories. And I believe Chief Justice Kilbride pointed that out in his dissent, is this court should have just had a specific holding and stuck to it, but they're aware of the fact that there's a split on this autopsy issue, that this is very likely to be the next issue to be taken by the United States Supreme Court, and having just been possibly burned on Williams, although it's hard to say what it stands for, they don't want to get burned again in another autopsy case, so they're kind of protecting themselves by having all these multiple holdings. But because Williams has no precedential value and can't be applied to this case, this court should look to previous cases, specifically Bolkoming, which I think is rather remarkably analogous to this case, and remain for a new trial. Thank you. Good morning, Your Honors. Again, my name is Assistant State's Attorney Amy Wittrobe on behalf of the people. The question Your Honors asked at the beginning of the argument is, what is there of Williams to follow? That is certainly an open question as courts in this country go forward in an attempt to apply the body of case law following Crawford, most recently Williams, to factual scenarios or issues that have not yet been addressed by the U.S. Supreme Court. This court need not delve too deeply into it here, because what we have in this case are DNA reports, specifically a cell mark report, and that issue has been addressed. Before I even get to that, though, I'm going to give the court the most direct route to reject defendants' arguments, which is, as Justice Paczynski noted, the fact that Dr. Reynolds, the DNA expert from Cellmark who testified, wrote the report in this case. She co-authored it. The fact that she co-authored it, yes. The way it works is there's two analysts who author the report. They both have done analysis and formed the opinion and they co-signed it. Do you see a difference between the relationship of Dr. Reynolds co-signing the Cellmark report to Mr. DiDomenico being a peer reviewer for the deceased Bosco's report? I see yes for two reasons. Well, they're different more based on what happened factually and that with Mr. DiDomenico, what Mr. Bosco did, deceased analyst Bosco, that was never admitted into trial. That was never discussed. DiDomenico relied on it. He relied on it for chain of custody purposes as he testified and I think as this court held. The opinions and the results of the now defunct RFLP testing that Mr. Bosco did were not admitted at trial. Mr. Bosco did not analyze the sample from the panties or the fingernail scrapings. Is that correct? That's correct. He only tested the vaginal swab? Yes, he did the extraction. The evidence still existed at the time, so if there was going to be any problem, Mr. DiDomenico could have done his own analysis on the remaining evidence. Isn't that correct? Well, Cellmark did. The way it worked is after the assault, the evidence went to the state police lab. The initial testing was done, the biological testing was done by... Mr. Bosco did the DNA extraction on the vaginal swabs? Correct, and then he did DNA analysis called RFLP analysis, which is no longer used. What happened to the other evidence? The other, like the... The rectal swabs, the fingernails? Those would have been untested. That standard protocol, that if they get a positive indication for semen and DNA on the most probative evidence, they defer testing on any remaining items. I'm just wondering why when people realize that Mr. Bosco had died and he was never going to be available to testify, the state didn't just say, oh, well, let's cover our tracks and test this other stuff. Because the other evidence was already retested under the modern technology of STR by Cellmark. So the vaginal swabs, the extraction was done, and then the DNA is in a tube, an Effendorf tube, and then it's split into multiple tubes, so you have multiple items. Initially, Mr. Bosco would have done the RFLP on one of those, and then everything else is stored and secured. And then it went to Cellmark, and they did the modern STR testing on that. And then that was what was used to get the DNA hit. On the vaginal swabs? On the vaginal swabs, that's correct. Before you get into the whole welcoming Melendez-Diaz-Williams and leach analysis, I'd ask you to address the harmless error question as well. You know, if there's a way to, you suggested one way that had been suggested by my colleague here to avoid the analysis, what about harmless error? Harmless would certainly be a way. The trial court here essentially found that any error in any admission of any DNA would be harmless when he found defendant guilty. He said even ignoring all of the DNA evidence that was presented at trial, I would still find this defendant guilty because of the way that his confession dovetailed with the very compelling testimony of the victim. As to specific details, such as the fact that after he finished assaulting her, he told her to count to 50 before she got up. The fact that he used her hoodie to cover her face. The fact that he approached her on the street from behind, locked her neck with his arm, took her to a grassy area. I mean, details. He identified a photograph of the victim. He was shown a photograph of the victim when he gave his statement and he said, yes, I assaulted her. And then proceeded to describe the assault in detail and her testimony dovetailed. She was not able to identify him in court, but that's because she never saw his face. But she did provide a lot of detail about the assault. So it is certainly harmless. Given the state of the law and the Confrontation Clause issue in light of Williams and Leach, if you were writing this decision, would you take the path of least resistance or is there some way, trying to segue you into your next argument, is there some way that you can find to get us through the morass that is left here? Harmless would be the simplest route. The second simplest would be to find, which I think is the correct decision with Dr. Reynolds, is that she testified at trial and since she authored the report, she's on the report, his right of confrontation was satisfied. But it's not just Dr. Reynolds we're worried about. It's Mr. D. Domenick's testimony about Mr. Bosco's work. And I still keep seeing those as two different things. And I guess with respect then, you could find that the right of confrontation was satisfied with Dr. Reynolds and that any testimony, if you see a problem there, which I still maintain there is not, you could find that any testimony about Mr. Bosco was certainly harmless. One, because no results or details of his analysis were ever admitted and two, because the ultimate opinion came from Mr. D. Domenico. That was the modern STR testing. So cumulative wouldn't be the right word since nothing came in from Mr. Bosco. But it really is just a step in the chain and an earlier testing done at a prior point in time that the results were never admitted or in any way used against him would be harmless. Any references to him would be harmless when D. Domenico testified about his results and then also that there were no signs of contamination or anything like that. He was only testifying about his results on the buccal swab. That's the part that he did himself. When he was testifying about what Mr. Bosco did, he was relying on apparently Mr. Bosco's notes which are not in the record. He's also able to assess that data. When you say relying on, he's able to look at the entire case file and he did testify based on his experience and his review that there were no signs of contamination. The issue of extraction would not be a problem with the profile. If there was a problem with the extraction step, it would be a technical problem, a lab problem. Those types of things are apparent from a case file. In the three cases here, Williams, Leach, and this one, there's a distinction in what was admitted into evidence as to the way the pluralistic view went. Maybe you can't. Maybe you don't see. But as I read them, there was a variance whether it was admitted or not. Here, certainly a distinction with Leach would be there was no paper admitted. There was no report in Leach. The court found that the autopsy protocol was admitted in addition to the testifying pathologist testimony. Here, no report of any type was admitted into evidence as an exhibit. That's one distinction, a factual distinction. No report was also admitted in Williams. However, the U.S. Supreme Court considered, actually got the Selmark report when it was lodged with the court. So they actually looked at a Selmark report and specifically held that Selmark reports are not testimonial. They may disagree on the reasons, but five held that, the plurality plus Justice Thomas and his, of course, vote turning on the solemnity of the document. So if DNA Selmark reports are not testimonial, certainly Illinois State Police lab notes are not testimonial. There's no distinction. There's no factual distinction. This was a no-suspect case, the same as Williams. There's really no, I understand your Honor's concern and your attempts to apply this admittedly. So the fact that there's no particular suspect is different than if the police lab, which only works for the police, presumably only in the furtherance of finding out who committed a crime, if they're trying to point the finger at one person, that's different than if they're just trying to say, okay, here's what we've got, let's wait until we find the guy? No, I actually don't, I'm not advocating that distinction, but it's a distinction that I know that arguments are being made by defendants in cases as a means to distinguish. So what I'm saying is that I actually don't think that is an arguable means of distinction, but insofar as if this were a case where that distinction could be made, then I'm just addressing it. I'm just pointing out that that distinction cannot be made. I'm kind of fronting any possible... All right, what does Leach say that Williams stands for? Educate me. What Leach does is Leach is tasked with taking the body of case law and now applying it to a new, a different type of testimony and a different type of document, namely a medical examiner and an autopsy report. So what Leach does is essentially and actually explicitly count votes. And Leach takes the tact of looking at the primary purpose analysis because that analysis is found throughout all of the cases post-Crawford's opinions. So that is an aspect of the Crawford confrontation analysis that appears in all of the cases. That appears to be the one paragraph where they're really trying to say what Williams stands for. It's paragraph 122. We conclude that whichever definition of primary purpose is applied, the autopsy report in the present case was not testimonial because it was, one, not prepared for the primary purpose of accusing a targeted individual or, two, for the primary purpose of providing evidence in a criminal case. Is that about all Leach says Williams stands for? Well, Leach says that Williams, if you're in a situation where you have to apply a primary purpose analysis, Leach looks to Williams as authoritative and instructive on where, again in a kind of a counting votes approach, where different votes may lie to then apply a primary purpose formulation to a new scenario. So that's what I would say. At the very least, Williams definitively stands for the fact that cell mark reports are not testimonial and that solemnity is a very important focus of the confrontation clause analysis. Now, if you're going to apply Williams in this case, if you do go that route, and you certainly... If you could direct me to that language, I'd be one happy judge. As would I. I would be a happy litigant. I mean, that's what I was talking with your colleague about, that if you were looking for something that would be repeatedly predictable in this area of law, it would be if there were five who said that in order for the confrontation clause to be triggered, there has to be the evidence of solemnity, formality, whatever. And what you just said, I think... I don't know that I can find that. In Williams? I don't know how you can tie what Thomas has steadfastly hung on to and attach it to the Alito form. There is a portion in the Williams opinion where the plurality recognizes that throughout the post-Crawford case law... That would be great if you could... There are two common threads that the court has... Let's see. One being the primary purpose and two being the solemnity. I'll try to find your paragraph. I've got the primary purpose, 122. Oh, here we are. Okay, it's on the slip opinion. It's on page 29 of the Alito plurality. The paragraph that begins with the abuses that the court has identified as prompting the adoption of the confrontation clause shared the following two characteristics. A, they involved out-of-court statements having the primary purpose of accusing a targeted individual of engaging in criminal conduct, and B, they involved formalized statements such as affidavits, depositions, prior testimony, or confessions. So I would say that if you're looking for a way to link up Thomas with the plurality, that would be your best quote from the plurality. I asked for it and you gave it to me. But then again, as the plurality notes, Hammond is arguably inconsistent with that. However, that was not addressed in the Williams briefing because that was not an issue at the time of briefing. And that kind of ties into Justice Breyer's concurrence where he felt that this was something that should have been addressed more often or should have been addressed again in additional briefing. So if there are no other questions, we ask this court to affirm. I would just note that we would ask this court to affirm without addressing the corpus delecti argument raised in supplemental briefing based on the fact that it's not properly before the court. I don't think that would be a problem. Okay. Thank you very much, Your Honors. What about the last suggestion that you could link that language from the Alito plurality to what Thomas has steadfastly maintained? That's precisely what I was going to address first. First, I would like to make the general point that the Alito plurality is four votes in the Williams decision, exactly the same number of votes as Justice Kagan's. So to the extent there's any holdings in Justice Alito's so-called plurality, there's four votes going the opposite way in Justice Kagan and Justice Thomas, who specifically said that it was a flawed analysis and disagreed with every respect. Now, had Justice Thomas agreed with that, that particular narrow thing that applied in this case, you would have a five-justice majority. They would have gone to the trouble, certainly Chief Justice Roberts, would have allowed for a situation where there was this 4-1-4 case with all these remands leaving a mess for lower courts to deal with. There was no overlap at all. That's why it's 4-1-4. Solemnity means something very specific to Justice Thomas that apparently does not mean to any of the eight other justices. That's why it's a one in the 4-1-4. There's no overlap at all. Counsel also pointed out about pieces of paper and the sort of evidence admitted. That was a very good argument for them between 2009 and 2011 because in Melendez-Diaz, it was a certified chemist's report that was admitted in evidence and nobody was testifying. But in Bohlkoming in 2011, you had this surrogate witness. You had a person sit on the stand like Dr. Reynolds did and testify to what somebody else did, and to a lesser extent, what Mr. DiDomenic and Ms. Ebenazi did with respect to Mr. Bosco's conduct. And in Bohlkoming, it rejected surrogate testimony and it described it as, quote, by another analyst who was familiar with the laboratory's testing procedures but had neither participated in nor observed the test. That's exactly what we have here. Yes, she's very familiar. That would be fine in a civil case, but in a criminal case, you've got the confrontation. Right. We have a Sixth Amendment right here, and this is a person who doesn't know exactly what happened. This is not enough to put on. The court made it very clear in Bohlkoming. And if we're going to talk about for-justice decisions, Justice Kagan's for-justice opinion made it very clear, until a majority of this Court reverses or confines Melinda's, Dia's, and Bohlkoming, I would understand them as continuing to govern in every particular of the admission of forensic evidence. Certainly Williams doesn't overrule Bohlkoming. That's still the law, and I'd ask this Court to apply it. Your Honor said some specific questions with respect to the facts of the case. For example, Mr. Bosco's notes. What Mr. Bosco allegedly performed was he actually took the physical evidence and extracted DNA from it and reduced it to swabs that were sent to Solmark. So I would submit that's forensic work by an analyst that requires some kind of technical skill to do that. Also, I think there was possibly some uncertainty with what happened to the physical evidence. It was Bosco's tubes that were sent to Solmark for testing. The panties and the other evidence presumably are still in cold storage at the Illinois State Police or somewhere else. The State absolutely could have had those retested and had a much cleaner chain and with respect to Dr. Reynolds' testimony, they could have very easily just called one of the analysts who actually performed the work for Solmark instead of calling her as a witness because they didn't do that. It created this large confrontation problem, and this Court should remand for a new trial. Thank you, Your Honor. Terrific briefing and arguments, and we will take it under consideration and get back to you. Thanks so much.